UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOL GROUP MARKETING COMPANY,

                                    Plaintiff,

            -against-

AMERICAN PRESIDENT LINES, LTD. and
APL CO. PTE LTD.,

                                    Defendants.

14-Cv-9929 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

        In late 2013 Sol Group Marketing Co. ("Sol") entered into a contract with American

President Lines Ltd. and APL Co. PTE Ltd. (collectively "APL") for APL to ship a certain

minimum volume of melons for Sol from Honduras and Guatemala to Los Angeles.  Sol alleges

that APL has failed to live up to its contractual commitments and has now brought suit against

APL, alleging breach of contract and fraud in the inducement of the contract.  Sol seeks both

money damages and a declaration that the liquidated damages clause in the contract is

unenforceable or, if it is enforceable, that it is not applicable to the alleged breach of contract.

Defendants have moved to dismiss Sol's fraud in the inducement claim and to dismiss partially

the declaratory judgment claim pursuant to Fed. R. Civ. P. 12(b)(6).[1]  Because Sol cannot allege

---

[1] Although defendants alternatively seek summary judgment in their favor pursuant to Fed. R. Civ. P. 56, the Court
declines APL's invitation to convert its motion to dismiss the Amended Complaint into a motion for summary
judgment.  The only document that the Court has considered on this motion that falls outside the pleadings is the
email exchange between Yanko Hauradou and Eduardo Brasil, which was submitted by plaintiff and is attached as
Exhibit A to the Declaration of Yanko Hauradou, dated June 25, 2015 ("Hauradou Decl.").  That email exchange is
properly considered upon a Rule 12(b)(6) motion because it is integral to the Amended Complaint, is referred to in
plaintiff's allegations, and contains the weekly schedule upon which the parties allegedly agreed and which is
central to the allegations of the First Amended Complaint, (*see* First Amended Complaint ("Am. Compl."), Dkt. No.
6 ¶¶ 40, 42).  *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 63 n.4 (2d Cir.

it reasonably relied on APL's purported misrepresentations and because Sol cannot allege

procedural and substantive unconscionability, APL's motion is granted.

## I. BACKGROUND

The following facts are as alleged in the First Amended Complaint and are taken as true

solely for purposes of this motion.

### A. The Parties

Plaintiff Sol Group Marketing Co. is a fresh produce marketing company that sells and

distributes produce—principally melons—in the United States and Canada.  (Am. Compl. ¶¶ 1,

7.)  The melons, which come from Honduran and Guatemalan farms, are shipped to the United

States via ocean carriers.  (*Id.* ¶ 7.)  Defendant American President Lines Ltd. is an ocean carrier

that transports merchandise by water for hire.  (*Id.* ¶ 2.)  Defendant APL Co. PTE Ltd. is an

agent for American President Lines.  (*Id.* ¶ 3.)  Federal subject matter jurisdiction is based on

both diversity of the parties and this Court's admiralty jurisdiction.  28 U.S.C. §§ 1332, 1333.

### B. Negotiations

Prior to the 2013-2014 season for shipping melons, Sol and APL had not engaged in

significant business with each other on the shipping route from Central America to Los Angeles.

Sol had previously primarily shipped its melons to the West Coast of the United States via the

carrier Maersk, one of APL's competitors.  (Am. Compl. ¶¶ 35, 37.)

The parties commenced their negotiations in the autumn of 2013, when Rafael Nir, Sol's

president at the time, initially met with Eduardo Brasil, an APL manager, at Sol's Florida offices.

(*Id.* ¶ 38.)  Nir and Brasil, along with Brasil's boss, met again in person in late October 2013 at

---

2012) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)); *see also Chambers v. Time Warner, Inc.*, 282
F.3d 147, 153 (2d Cir. 2002)

the Produce Marketing Association annual meeting, piquantly known as the "Fresh Summit." (*Id.*)  After these initial meetings, Yanko Hauradou continued negotiations with APL on behalf of Sol via both email and telephone.  (*Id.*; *see* Hauradou Decl., Ex. A.)

At one point during the negotiations, Sol requested that APL agree to carry 2,040 containers of melons for the 2013-2014 season.  (Am. Compl. ¶ 40.)  APL, however, rejected Sol's request, countering that it could make available and ship only 1,020 containers at an average of approximately 50 containers per week for 20 weeks.  (*Id.*; Hauradou Decl., Ex. A at 3.)

On October 23, 2013, Brasil emailed Hauradou to confirm that APL was offering Sol a rate of $4,000 per container, which would be reduced to a "VIP rate" of $3,600 per container if Sol met a minimum volume commitment ("MVC"), from December 1, 2013 through May 1, 2014.  (*See* Hauradou Decl., Ex. A at 4; *see also* Am. Compl. ¶¶ 40-42 & Ex. A ("Service Contract"), App'x E.)  In response, Hauradou asked Brasil to provide the specific sailing and arrival dates of each shipment, as well as the MVC that Sol would have to meet to in order to receive the VIP rate.  (Hauradou Decl., Ex. A at 3-4.)  According to the Amended Complaint, the VIP rate was a "key inducement to Sol to enter into the service agreement" because APL's proposed rate was otherwise more expensive than Maersk's.  (Am. Compl. ¶ 41.)

On October 23, 2013, Brasil wrote back to Hauradou that the MVC was 1,020 containers. (Hauradou Decl., Ex. A at 2.)  Brasil's email also included a schedule outlining the volume of containers that he stated APL could take each week, starting with calendar week 49 of 2013 and running through calendar week 19 of 2014.  (*Id.* at 2-3.)  Brasil followed up with Hauradou two days later to inquire whether he could move forward with the new service contract draft.  (*Id.* at 2.)  On October 29, 2013, Hauradou confirmed that Brasil could proceed.  (*Id.*)  Brasil tendered

the written Service Contract in early November, and the parties entered into the agreement on or about November 14, 2013.  (Am. Compl. ¶¶ 9, 57.)

### C.  The Service Contract

The Service Contract lists $4,000 per container as the shipping rate, but provides that APL would "pay refunds in the amount of US$ 400.00 per FEU[2] to the merchant based upon the cargo shipped between the effective date and expiration date of the service contract." (Service Contract, App'x E.)

The only MVC reflected in the contract is 1,020 containers over the course of the contract term; this MVC was later reduced to 700 containers by an amendment to the Contract.  (*Id.*; Am. Compl. ¶ 10 & Ex. B ("Am. Service Contract"), App'x E.)  The Service Contract and its appendices do not reflect the weekly schedule explicitly set forth in Brasil's October 23, 2013 email or any other weekly schedule.  (*Compare* Service Contract *with* Hauradou Decl., Ex. A at 2-3.)  Instead, the Service Contract specifically disclaims that APL is bound by a weekly schedule.  It provides:  "Unless Carrier [*i.e.*, APL] has explicitly agreed to provide specific weekly or per-sailing space and/or equipment guarantees in the applicable Appendices hereto, Carrier does not guarantee equipment availability and/or space on individual sailings or on a weekly basis."  (Service Contract, Clause 4(a).)  It goes on to state:  "Carrier's failure to accept a timely offered shipment or its failure to provide container equipment for such a shipment (hereafter a 'Booking Refusal') shall not be a breach of this Contract, unless such failures, taken together, result in Carrier's failure to carry the Merchant's [*i.e.*, Sol's] MVC over the term of the Contract."  (*Id.*)

---

[2] "FEU" stands for forty-foot equivalent unit and also refers to a shipping container.

In addition to these specific terms, the Service Contract includes a merger clause providing that the agreement "embod[ies] the entire understanding between the parties. There are no other agreements, understandings, conditions, warranties or representations, oral or written, express or implied, with reference to the subject matter of this Contract, which are integrated herein." (*Id.*, Clause (1)(a).)

Finally, the Service Contract also contains the following liquidated damages clause:

> In the event Merchant timely and properly tenders its MVC and one or more Carrier Booking Refusals results in carriage of less than Merchant's MVC during the term of this Contract in one or more Appendices, the parties acknowledge that Merchant may suffer damages, and that such damages are difficult to estimate or value. Accordingly, the Carrier shall pay liquidated damages in the amount of US$350 per FEU by which Carrier's Booking Refusal(s) results in carriage of less than the Merchant's MVC during the term of this Contract.

(*Id.*, Clause 4(c).)

Sol alleges that it did not have an opportunity to negotiate the terms of the Service Contract, and, indeed, according to SOL, the parties never discussed any number to be used in the liquidated damages clause. (Am. Compl. ¶¶ 57, 77-78.) Sol also alleges that APL provided the contract on a "take it or leave it" basis. (*Id.* ¶ 77.) By the time Brasil provided the written agreement in early November, the melon season was about to commence and other ocean carriers had already committed their cargo space to other customers. (*Id.* ¶¶ 57, 77.) Sol claims it therefore had no other options but had to proceed with APL as its carrier. (*Id.* ¶ 57.)

**D. The 2013-2014 Season**

When the 2013-2014 melon season commenced, APL failed to comply with the weekly schedule that Hauradou and Brasil had discussed via email. (*Compare id.* ¶¶ 13-20 *with* Hauradou Decl., Ex. A at 2-3.) Over the course of 11 weeks, starting with the third week of service under the Service Contract, APL carried and delivered to Los Angeles only 163 of the

430 containers of melons that Sol alleges that APL was obligated to carry, (*see* Am. Compl. ¶¶ 13-20), and of those 163 containers 21 were late, (*see id.* ¶¶ 14-19.)

Melons are highly perishable, and must be stored in refrigerated containers under temperature controlled conditions; consequently, any fruit that either was left behind because APL did not supply a container to carry it, or was delivered late, deteriorated.  (*Id.* ¶¶ 13, 17-19, 46.)  As a result, some of the fruit had to be discarded, and Sol had to find alternate storage and shipping means for some.  (*See id.* ¶¶ 17-19, 21.)

Sol claims that APL never disclosed that it was unable to meet the weekly schedule set forth in the Hauradou-Brasil email exchange dated October 23, 2013.  (*See id.* ¶¶ 58-64.)  In fact, according to Sol, APL continued to request that Sol provide the required volume of fruit to APL, but that, after Sol tendered the fruit, APL, "in its sole discretion and regardless of what it promised to do in the Contract," decided what it accepted and carried based on whatever number of containers APL had available at that time.  (*Id.* ¶ 64.)

Sol alleges that Brasil and his boss either knew APL did not have the ability and capacity to comply with the minimum volume commitment that Sol had given or acted with recklessness and deliberate ignorance of the fact that Sol would not be provided with the agreed upon number of containers.  (*Id.* ¶ 60.)  Sol also contends that APL and its agents knew that their representations about the MVC and the VIP discount were false, but nonetheless made those statements, intending for Sol to rely upon them.  (*Id.* ¶ 61.)

### E.  Damages

According to Sol, it has suffered significant damages, including the costs of using other carriers to ship the melons that APL did not accept, inland freight charges to transport melons from Sol's locations on the East Coast of the United States to the West Coast in order to meet its

West Coast customers' demands, as well as the costs of repacking and discarding fruit, and the higher freight costs owed to APL because APL impeded Sol from meeting the MVC required in order to earn the VIP discount.  (Am. Compl. ¶¶ 21-22.)

### F.   This Litigation

Sol commenced this action in December 2014.  After the initial pretrial conference was continued for unfruitful settlement discussions, Sol filed its First Amended Complaint on April 1, 2016; two of the four claims are relevant to this motion. (*See* Am. Compl.)  Count II alleges that APL fraudulently induced Sol to enter into the contract by misrepresenting that APL had the ability to, and would timely, ship an agreed upon number of containers according to an agreed upon weekly schedule.  (*See id.* ¶¶ 34-67.)  In Count IV, Sol seeks a declaratory judgment that the liquidated damages provision of the Service Contract is unenforceable because it is a contract of adhesion and is also unreasonable.  (*See id.* ¶¶ 73-85.)  Sol additionally seeks a declaration that the liquidated damages provision, even if enforceable, does not apply.

## II.  STANDARD OF REVIEW

In evaluating a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011).  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint should be dismissed where the claims have not been "nudged…across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

7

## III. DISCUSSION

### A.  Sol Fails to State a Claim for Fraud in the Inducement

At oral argument on this motion, Sol confirmed that the only alleged misrepresentation at issue concerns APL's purported ability and capacity to ship Sol's melons according to the weekly schedule set forth in the Hauradou-Brasil email exchange dated October 23, 2013.  (Jan. 6, 2016 Tr. at 16-17.)  APL contends that as a matter of law Sol cannot have justifiably relied upon this alleged misrepresentation because the Service Contract expressly contradicted it.[3] APL urges that the contract's language specifically excludes any parol evidence regarding the weekly schedule, and furthermore, Sol's sophistication precludes reasonable reliance on any such extra-contractual statements.

Sol argues that pursuant to the "special facts" or "peculiar knowledge" doctrine, APL owed Sol a duty to disclose that APL did not have the ability or capacity to carry Sol's melons according to the weekly schedule contained in the Hauradou-Brasil email exchange.

Pursuant to New York law, in order to maintain an action for fraud, a complaint must contain allegations that taken as true would support the claim that the plaintiff reasonably relied upon a misrepresentation made by the defendant.  *ACA Fin. Guaranty Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1044-45 (2015).  Although "the question of what constitutes reasonable

---

[3] The Court notes that plaintiff fails to plead the alleged misrepresentations that it complains of with the particularity required by Fed. R. Civ. P. 9(b).  APL has not argued that Count II should be dismissed for failure to comply with that rule.  In the Amended Complaint, Sol appears to assert that APL misrepresented that it could comply with the MVC of 1,020 containers over the course of the contract and that Sol would receive the VIP rate.  (*See, e.g.*, Am. Compl. ¶¶ 58-62, 67.)  APL focused on these alleged misrepresentations in its opening brief, (*see* Defs.' Mem. in Supp. of Partial Mot. to Dismiss ("Br."), Dkt. No. 22 at 11-14), but Sol did not respond to APL's arguments about those misrepresentations in its opposing brief.  Indeed, any claim for fraud in the inducement based on those representations is impermissibly duplicative of plaintiff's breach of contract claim since those representations concerned APL's intent to perform terms of the Service Contract.  *See, e.g., Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101, 2004 WL 1574629, at *11-12 (S.D.N.Y. July 14, 2004).

reliance is not generally a question to be resolved as a matter of law on a motion to dismiss," *id.*, in certain circumstances the issue may be decided on the pleadings, *see, e.g.*, *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195-96 (2d Cir. 2003); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 319-323 (S.D.N.Y. 2002); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 319, 323 (1959).

New York courts generally prohibit the introduction of parol evidence when a contract specifically disclaims reliance on or expressly contradicts extra-contractual representations on the same topic, even when the extra-contractual statements are offered to substantiate a claim of fraud.  *See DynCorp*, 215 F.2d at 319; *Danann Realty*, 5 N.Y.2d at 319-321.  An exception exists where the party alleged to have made the misrepresentation had "peculiar knowledge" of the relevant facts, meaning the aggrieved party could not have discovered the truth through the exercise of due diligence.  *See Danann Realty*, 5 N.Y.2d at 320-22; *see also Schumaker v. Mather*, 133 N.Y. 590, 596 (1892).

The "peculiar knowledge" exception, however, is applied stringently when the contracting parties are sophisticated entities, as they are here.  *See, e.g.*, *DynCorp*, 215 F.2d at 322.  In particular, New York state and federal courts have reasoned that when the parties are sophisticated companies or businessmen, the "peculiar knowledge" exception should "not apply where the plaintiff had a low cost alternative such as 'insisting that the written contract terms reflect any oral undertaking on a deal-breaking issue.'"  *Bibeault v. Advanced Health Corp.*, No. 97 Civ. 6026, 2002 WL 24305, at *5 (S.D.N.Y. Jan. 8, 2002) (quoting *Warner Theatre Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998)); *see Rodas v. Manitaras*, 159 A.D.2d 341, 343 (1st Dep't 1990).  "Succinctly put, a party will not be heard to

complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." *Rodas*, 159 A.D.2d at 343.

Here, the Service Contract expressly contradicts the extra-contractual representations at issue, and specifically states that "[u]nless [APL] has explicitly agreed to provide specific weekly or per-sailing space and/or equipment guarantees in the applicable Appendices hereto, [APL] does not guarantee equipment availability and/or space on individual sailings or on a weekly basis." (Service Contract, Clause 4(a).)  The appendices themselves do not contain any weekly schedule.  (*See id.*, App'x E.)  Accordingly, when Sol signed the Service Contract, it had notice that APL had the right to refuse shipments if no such schedule was included in the appendices.  Nevertheless, Sol went forward with the agreement.

Sol alleges that it relied on statements that defendants made regarding information solely within APL's knowledge—namely, whether APL had the capacity and ability to comply with a weekly delivery schedule.  Yet, Sol, with extensive experience in the shipping industry, is a sophisticated party for these purposes.  (*See, e.g.*, Am. Compl. ¶¶ 7, 10, 35-41, 45, 47, 56, 62.)  It notably alleges that the Service Contract was worth approximately $20 million and that it was a "significant" and "major" customer for APL, (*id.* ¶¶ 45, 47, 62), and had in fact previously entered into two other agreements with APL, albeit on a lesser scale, (*id.* ¶ 35).  In addition, the Amended Complaint reflects that Sol negotiated an amendment to the Service Contract to reduce the MVC, thus demonstrating its negotiating ability.  (*See id.* ¶ 10; Am. Service Contract, App'x E.)

"As a substantial and sophisticated player" in the produce shipping industry, Sol had "a duty to protect itself from misrepresentation."  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997).  Sol, however, does not allege that it took any steps to

safeguard its interests, even though there were obvious and easy steps that it might have taken. Sol could have insisted that the written Service Contract terms contained a weekly schedule. *See Bibeault*, 2002 WL 24305, at *5. Or, having been put on notice that APL could reject timely offered containers, Sol could have requested further information about APL's capacity and equipment availability. The facts as reflected in the Amended Complaint set forth no such actions.

### B.   Sol Has Failed to Allege that the Liquidated Damages Clause Is Unenforceable

APL also moves to dismiss plaintiff's declaratory judgment claim, (Count IV), but solely to the extent that Sol seeks a declaration that the liquidated damages clause is unenforceable because it is part of a contract of adhesion and is also unconscionable as a matter of law as a penalty; APL's motion does not address plaintiff's request for a declaration that the clause, even if enforceable, does not apply. Accordingly, the Court addresses Count IV only to the extent Sol contends that the liquidated damages clause is unenforceable.

According to Sol, APL used "high pressure tactics," "deceptive language," and "unequal bargaining power" to get Sol to sign an unfavorable agreement. (Plfs.' Opp'n to Mot. to Dismiss ("Opp'n"), Dkt. No. 27 at 15 n.5.) In particular, Sol alleges that by the time APL provided it with the written Service Contract, all other ocean carriers had already committed their shipping volume to carry other cargo; as a result, APL was its only available option. (*See* Am. Compl. ¶ 57.) Thus it had no opportunity to negotiate the contract and had no choice but to enter the agreement.

Sol also claims its damages are in excess of $1 million, and thus the amount of liquidated damages fixed in the contract—$350 per FEU, (Service Contract, Clause 4(c))—is not proportionate to its actual injury or to the injury contemplated when the parties entered the

Service Contract.  In fact, Sol alleges that the parties never estimated Sol's potential damages or negotiated the terms of the written contract.  Sol contends the damages are so low that they make APL's minimum volume commitment illusory.

Pursuant to New York law, "[a]dhesion is found where the party seeking to enforce the contract used high pressure tactics or deceptive language in the contract and where there is inequality of bargaining power between the parties.  In addition, it must be shown that the contract inflicts substantive unfairness on the weaker party."  *Milgrim v. Backroads, Inc.*, 142 F. Supp. 2d 471, 475-76 (S.D.N.Y. 2001) (quoting *In the Matter of the Arbitration of Karen Ball*, 236 A.D.2d 158, 161 (3d Dep't 1997)).  These inquiries are equivalent to the two elements that must be met to find unconscionability: procedural unconscionability and substantive unconscionability.  *Compare id. with Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10-11 (1988).

### 1.   *Plaintiff Has Failed to Allege Procedural Unconscionability*

"Typical contracts of adhesion are standard-form contracts, offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms."  *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (internal citations and quotation marks omitted).  New York courts have previously found that no contract of adhesion or procedural unconscionability exists where—as here—the party complaining is commercially sophisticated. *See, e.g.*, *Matter of Surrey Strathmore Corp. v. Dollar Sav. Bank of N.Y.*, 36 N.Y.2d 173, 178 (1975); *Greenwald v. Weisbaum*, 6 Misc. 3d 281, 284 n. 4 (New York Cty. 2004); *Gillman*, 73 N.Y.2d at 11.  Moreover, there is no contract of adhesion where the complaining party had the

option of engaging in business with another company or individual besides the defendant before signing the contract.  *See Finsel v. Wachala*, 79 A.D.3d 1402, 1403-04 (3d Dep't 2010).

As set forth above, Sol is a sophisticated party.  Sol's conclusory contention that it suffered from an inequity of bargaining power is belied by its allegations that it was able to negotiate both a VIP rate and an amendment to the contract.  (*See* Service Contract, App'x E; Am. Service Contract, App'x E; Am. Compl. ¶ 10.)  Further, Sol's allegation that it had no choice but to enter the agreement is directly contradicted by its claim for damages resulting from the fees it incurred by using alternative carriers.  (*See* Am. Compl. ¶¶ 21, 48.)  Moreover, there is no allegation that APL was Sol's sole option for shipping melons when it began negotiations for the 2013-14 season.  As Sol alleges, it had previously conducted business with Maersk, a competitor of APL's, and decided to shift its business to APL.  (*See id.* ¶¶ 37-39, 41, 43, 47-48, 56.)

Additionally, Sol cannot argue that it was unaware of the challenged liquidated damages clause, which appeared in the contract signed by Sol's president.  Sol has not alleged in its complaint that it did not have time to read and understand the agreement.  *Cf. Morris v. Snappy Car Rental, Inc.*, 84 N.Y.2d 21, 30 (1994).  In fact, the Amended Complaint reflects that Sol had time to review the contract between when Brasil sent it in early November and when Nir signed it on behalf of Sol on or around November 14, 2013.  (*See* Am. Compl.  ¶¶ 9, 57.)  Regardless, a party who signs a contract is presumed to have read it.  *See Gillman*, 73 N.Y.2d at 11.

Although in some cases a contractual provision might be "so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone," generally the party seeking to void a provision must allege both procedural and substantive unconscionability. *NML Capital v. Republic of Argentina*, 621 F.3d 230, 237 (2d Cir. 2010).  Here, Sol's failure to

allege procedural unconscionability and its status as a sophisticated party are enough to dismiss its request for a declaration that the liquidated damages clause is unenforceable.

> **2.   *Plaintiff Has Failed to Allege Substantive Unconscionability and the Liquidated Damages Clause Is Not a Penalty***

Even if the Court were required to analyze substantive unconscionability, plaintiff fails to allege substantive unconscionability as well.

The Court is confronted with the somewhat unusual case where the non-breaching party—Sol—is the one challenging the validity of a liquidated damages clause.  Usually the breaching party contests the imposition of liquidated damages, arguing the pre-determined amount is an unreasonably high estimate that acts as a penalty compelling performance in violation of public policy.  *See Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977).  Here, however, Sol argues that the amount provided for in the liquidated damages provision is far *too low*, incentivizing APL to breach.  "Thus the true nature of the claim is that the clause should be stricken on the ground of unconscionability," and not as a penalty.  *M. Viaggio & Sons, Inc. v. City of New York*, 114 A.D.2d 939, 940 (2d Dep't 1985).

As a result, all but one of the cases cited by Sol are inapposite because they pertain to a party arguing that a liquidated damages provision should not be enforced to make the complaining party pay since the amount of damages the contract fixed operated *in terrorem* to compel performance.  (*See* Opp'n at 15-25 (citing, *e.g.*, *Pacific Cap., Inc. v. Tano, Inc.*, 877 F. Supp. 180, 184 (S.D.N.Y. 1995); *Truck Rent-A-Center, Inc.*, 41 N.Y.2d at 424; *Pyramid Centres & Co. v. Kinney Shoe Corp.*, 244 A.D.2d 625, 627 (3d Dep't 1997)); Dkt. No. 40 (collecting cases).)

Only one case that plaintiff cites involves a non-breaching party that complained that the damages were *too low*.  In *Dole Ocean Liner Express v. Georgia Vegetable Co.*, Georgia

Vegetable had contracted for Dole to carry 170 containers of Georgia Vegetable's onions, but Dole only carried 12 containers.  84 F.3d 772, 773, *modified on rehearing*, 93 F.3d 166 (5th Cir. 1996).  The parties' contract contained a clause providing that Dole would pay Georgia Vegetable up to $500 for each container Dole did not carry.  *Id.* at 774 & n.4.  An arbitral panel determined the liquidated damages did not provide "just and reasonable" compensation and awarded Georgia Vegetable expectancy damages in excess of $500 per container.  *Id.* at 773.

Although *Dole Ocean Liner Express* involved analogous facts, it is of minimal value to plaintiff.  First, the court and arbitral panel looked to Mississippi law regarding liquidated damages clauses—not New York law.  *See id.* at 774.  Second, a highly deferential standard of review is applied to arbitral awards.  *Id.* at 774-75; *see also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208-09, 212 n. 8 (2d Cir. 2002).

While the costs that plaintiff sustained may have been greater than $350 per container, parties to a contract have a broad right to stipulate in their agreement the amount of damages recoverable in the event of a breach so long as the agreed amount is not unconscionable and does not violate public policy.  *See Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990); *see also DynCorp.*, 215 F.2d at 317-18.  The liquidated damages clause here may be a rotten deal for Sol, but it does not violate public policy.  Defendants point out that the United States Shipping Act of 1984, as amended by the Ocean Shipping Reform Act of 1998, sanctions the use of liquidated damages clauses in shipping service agreements in order to put the parties on notice of the risks involved from the outset of the relationship.  *See* 46 U.S.C. § 40502(c)(8); 46 C.F.R. §§ 530.3(q), 530.8(b)(7).  Moreover, there is mutuality, as both APL and Sol are subject to the same $350 per container liquidated limitation on damages.  Both parties were bound by the contract, and APL would be responsible for any breach.

## IV. CONCLUSION

As set forth above, Count II seeking recovery for fraud in the inducement is dismissed because Sol has not—and cannot—allege reasonable reliance as a matter of law. Count IV is dismissed to the extent it seeks a declaration that the liquidated damages clause is unenforceable because plaintiff cannot allege procedural and substantive unconscionability. Count IV, however, remains a claim in this action to the extent that plaintiff seeks a declaration that the liquidated damages clause does not apply.


Dated:   New York, New York
         January 15, 2016

SO ORDERED:

Sidney H. Stein, U.S.D.J.

16